## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

KELLY Q.,

          Plaintiff,

          v.

KILOLO KIJAKAZI,
Acting Commissioner of Social Security,

          Defendant.

Case No. 18-CV-3998

Judge John Robert Blakey

### MEMORANDUM OPINION AND ORDER

Plaintiff Kelly Q., who suffers from Crohn's disease, Barrett's Esophagus, degenerative disc disease, asthma, and morbid obesity, among other ailments, seeks reversal under 42 U.S.C. § 405(g) of an administrative law judge's ("ALJ") determination that, despite her impairments, she has the residual functional capacity ("RFC") to perform past work as a 911 dispatcher. [12]. The Commissioner also seeks summary judgment affirming the ALJ's decision, [21]. For the reasons explained below, the Court grants Plaintiff's motion [12], denies the Commissioner's motion [21], and reverses and remands the case.

## I.    Background[1]

### A.    Procedural History

In November 2014, Plaintiff applied for disability insurance benefits, claiming that she became disabled in June 2013 because her Crohn's disease, Barrett's Esophagus, asthma, allergies, scoliosis, and attention deficit hyperactivity disorder

---

[1] The Court draws all facts from the Administrative Record, [9], hereinafter referred to as "R."

rendered her unable to work. R. at 1031–39. Her claim was initially denied on May 6, 2015, R. at 925–36, 954, and upon reconsideration on August 26, 2015, R. at 938–52, 964–68. On February 17, 2017, the ALJ issued a written decision finding Plaintiff was not disabled as defined under the Social Security Act ("SSA"), R. at 863–75, and the Appeals Council denied review on April 4, 2018, R. at 1–4, making the ALJ's decision the final decision of the Commissioner for review, *see Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015).

### B.    Medical Record Evidence

Plaintiff's medical records show that as early as June 2012 she sought treatment for abdominal pain and severe diarrhea. R. at 1209–13. Doctors initially diagnosed her with Barrett's Esophagus (a condition affecting the lining of the esophagus) and ulcerative colitis (inflammation of the colon lining). *Id.* Then in 2013, a gastroenterologist diagnosed her with Crohn's disease. R. at 1344–46. The doctor prescribed her a chemotherapy drug, 6 MP, which initially improved her symptoms but did not resolve her condition. R. at 1310, 1468. From 2013 to 2016, the severity and frequency of her symptoms fluctuated, as her doctors tried numerous prescription medications, but Plaintiff consistently reported frequent abdominal pain. For example, she reported using the bathroom 8–10 times on a bad day in July 2013, R. at 1304; 3–8 times on a bad day in September 2014, R. at 1322; 2–3 times on a bad day in November 2014, R. at 1324; 7–8 times on a bad day in December 2014, R. at 1414; 3–4 times on a bad day in January 2015, R. at 1623; 10–20 times on a bad day in July 2015, *id.*; twice a day in November 2015, R. at 1632; and 3–5 times on a good day but 10–15 times on a bad day in September 2016, R. at 1748–53. Her records

also show that, at times, she self-discontinued her prescribed medications, reporting after-the-fact that she suffered problematic side effects. For example, she self-discontinued 6 MP twice in 2014 and once in both 2015 and 2016 but restarted it when her stomach issues worsened. R. at 872, 1318, 1324, 1630–31. She also self-discontinued Humira, claiming it no longer helped and gave her side effects including body aches. R. at 1611.

Plaintiff's medical records also indicate that she suffered from a host of other maladies over the years. As early as 2012, she repeatedly sought treatment for upper respiratory and sinus issues, including a bout of pneumonia in July 2012, loss of smell, asthma and recurring sinus infections and bronchitis. R. at 1209–27, 1307. In September 2012, she began seeking treatment for back and knee pain. *Id.* An MRI revealed a disc herniation, but it improved with physical therapy and spinal injections. R. at 1310–15. Then, in July 2014, she told her gastroenterologist that she had trouble concentrating and processing information. R. at 1300–01. At her doctor's recommendation, she went for psychiatric testing, and a psychiatric nurse practitioner diagnosed Plaintiff with "Attention Deficit Disorder of Childhood With Hyperactivity" and prescribed medication to treat her symptoms. R. at 1535–55.

In addition, in late 2015, Plaintiff saw a rheumatologist, Dr. Muthalaly, regarding chronic pain to her elbows, feet, ankles, wrists and hands. R. at 1773–75. Dr. Muthalaly diagnosed her with fibromyalgia but noted she had normal and full range of motion in her elbows, wrists, and ankles, with tenderness to the bilateral hands. *Id.* He prescribed Cymbalta to manage pain symptoms, following which

3

Plaintiff reported "remarkable," but not complete, relief. R. at 1611. Over this time, doctors also diagnosed Plaintiff with other conditions, including sleep apnea, pre-diabetes, hypothyroidism, morbid obesity, and ovarian cysts.

### C.    Plaintiff's Work History and Subjective Evidence'

Plaintiff previously worked as a full-time IT technician (1998–2002, 2004), part-time salesclerk (2004), part-time school bus driver (2004–2008), part-time advertisement merchandiser (2005–2006), full-time 911 dispatcher (2007–2013), and part-time school food server (2013–2014). R. at 1097, 1120. During the hearing before ALJ Smith, Plaintiff testified that she quit her 911 dispatch job in 2013 because she frequently called off work because of bowel incontinence and stomach pain and her frequent, urgent, and lengthy bathroom breaks made it impossible for her to perform the job as required, since she was not allowed to get up freely to use the bathroom. R. at 892, 896.

After leaving her 911 dispatcher job, she took a part-time lunch server position at an elementary school. R. at 890–91. But she claimed that she continued to suffer stomach pain, bowel incontinence and urgency, upper respiratory issues, and back and joint pain. *Id.* These afflictions, she testified, caused her to frequently call out sick or need many breaks. *Id.* Although she completed the 2013–2014 school year, she testified that her employer told her she could not return the next year because of her repeated absences and work interruptions. *Id.*

Plaintiff testified that medications have helped, but not eliminated, her many afflictions. Some, like the Humira she took for her Crohn's disease, helped initially

but stopped working and had significant side effects. R. at 898. She also testified that she continues to take 6 MP, which stops "the Crohn's from being too active." R. at 899. She rated her stomach pain as 10 out of 10, sometimes leaving her unable to walk without her husband's assistance. R. at 898. She takes dicyclomine and tramadol to reduce cramping but refuses to take stronger pain medications because she has seen "too many people who have gone down bad paths with that." R. at 899. Overall, she testified that, although her symptoms have improved since 2012, she can still have up to 6–10 bowel movements on good days and up to twenty with severe cramping on bad days. R. at 896, 914–15. She also claimed to have seven to ten "bad days" per month and cannot identify a trigger, other than suspecting stress or allergies. *Id.* at 915. She spends 5–10 minutes in the bathroom each time, and when she feels the need to void, she can sometimes hold off on using the bathroom for 15–20 minutes but other times she finds herself "shuffling to the bathroom quickly" and "unable to make it" with "frequent accidents." R. at 897, 915.

The ALJ also questioned Plaintiff about her daily activities. She testified that she grocery shops, cooks dinner, drives her children to events, and can do some household chores, although her stomach pain limits her ability to bend over, and her back, hip, knee, ankle, and foot pain keeps her from comfortably walking more than a block, standing more than twenty minutes, or sitting for more than an hour. R. at 901–02, 909–10. She also testified about ongoing sleep issues from her diagnosed severe sleep apnea, constant pain and frequent need to use the bathroom during the night. R. at 911. She reported needing to lie down to nap from 1–3 pm every day,

even on days when she is "feeling good." R. at 914. She also confirmed that she recently took a family vacation to California, where she visited the zoo but had to take breaks to sit or use the bathroom. R. at 903, 905.

She confirmed that her asthma remains well controlled with an inhaler and she only requires nebulizer treatments when sick. R. at 903. She also testified that she no longer sees a psychiatrist or counselor and does not take any medications for her psychiatric issues other than Cymbalta for anxiety (although her rheumatologist—not a psychiatrist—prescribed it to alleviate pain from fibromyalgia). R. at 904. She confirmed that the Cymbalta helps control her joint pain symptoms somewhat, although she can only take a half dosage because of stomach pain side effects. *Id*. Overall, she rated her joint pain at a constant 7 out of 10 even with the Cymbalta. *Id*. at 909–10. She also testified that, for years, she struggled with hand stiffness and her fingers frequently "cramp and stick straight or stick bent." R. at 907. She acknowledged that her rheumatologist found she can pass finger strength tests and has not "really addressed" her hand complaints, but claimed she struggles to "open a jar," "cut vegetables for a long time," or "twist the can opener all the way." R. at 907–08. Finally, she admitted that her gastroenterologist found her "noncompliant" with follow-ups in July 2015 notwithstanding "exacerbation of diarrhea," but she blamed this on her primary care doctor's slow referral process. R. at 911–12.

D.    **State-Agency Experts**

Three state-agency medical consultants offered opinions about Plaintiff's condition. First, in April 2015, clinical psychologist John Brauer interviewed Plaintiff about her claimed mental status and reviewed her medical records. R. at 1558–61. He found that she did not meet the diagnostic criteria for ADHD, but he diagnosed her with an adjustment disorder with anxiety from "the impact of her illness on her ability to live her life," including fears about the "trajectory of her illness" and "the social impact of incontinence in public." *Id*. at 1561.

Second, in March 2015, Dr. Richard Lee Smith reviewed Plaintiff's medical records (but did not independently examine Plaintiff) to determine her medically determinable impairments ("MDI") and establish her RFC. R. at 925–36. He categorized as severe her inflammatory bowel disease/Crohn's disease, obesity, and spine disorders; but categorized as non-severe her asthma and anxiety disorders. *Id*. at 929. He also found only partially credible her statements "regarding the functional limitations" imposed by her MDIs but did not explain which portions of her claimed functional limitations he found non-credible, particularly with respect to her inflammatory bowel disease/Crohn's disease symptoms. *Id*. at 930. Overall, he concluded, Plaintiff had an RFC for "a broad range of light work," but noted "limitations to occasional climbing, kneeling, stooping, crawling and crouching, as these may exacerbate abdominal pain" symptoms. *Id*. at 934.

Third, in August 2015, Dr. Mary Ann Westfall also reviewed Plaintiff's medical records (but did not independently examine Plaintiff) to determine her MDIs and

RFC.  R. at 938–51.  Dr. Westfall categorized Plaintiff's asthma as severe, but otherwise agreed with Dr. Smith's MDI and RFC determinations.  *Id*. at 944–50.

### E.    ALJ's Decision

On February 2017, the ALJ found Plaintiff not disabled after conducting the five-step sequential test set out in 20 C.F.R. § 404.1520(a)(4).  R. at 860–75.  This five-step test examines whether: (1) the claimant has performed any substantial gainful activity during the period for which claimant asserts disability; (2) the claimant has a severe MDI or combination of MDIs; (3) the claimant's impairment meets or equals any listed impairment; (4) the claimant retains the RFC to perform claimant's past relevant work; and (5) the claimant is able to perform any other work existing in significant numbers in the national economy.  *Id*.; *see also Zurawski v. Halter*, 245 F.3d 881, 885 (7th Cir. 2001).

The ALJ found that Plaintiff had not engaged in substantial gainful activity since June 1, 2013 (Step 1); and that Plaintiff had a combination of severe MDIs including Crohn's disease, Barrett's Esophagus, degenerative disc disease of the lumbar spine with lumbar radiculopathy, asthma due to allergies, and morbid obesity (Step 2); but that none met or equaled a listed impairment (Step 3).  R. at 865.

Turning to Step 4, the ALJ considered the medical record, the state-agency medical opinions, Plaintiff's own testimony about her symptoms, and the testimony of a third-party vocational expert.  The ALJ found that Plaintiff's MDIs could reasonably be expected to cause her claimed symptoms but found Plaintiff's statements concerning the intensity, persistence and limiting effect of her symptoms

"not entirely consistent with the medical evidence and other evidence in the record."
R. at 869, 872. Specifically, he found that, although the medical records confirmed
Plaintiff's claimed abdominal pain, they did not support a 10 out of 10 pain level. *Id.*
at 872. The ALJ also found that although the medical records supported some of
Plaintiff's claimed bowel incontinence and bathroom use, the records revealed that
her symptoms improved when she took medications, yet she self-discontinued these
medications from time-to-time without consulting her doctors. *Id.* He noted that she
most recently reported to her gastroenterologist only 3–5 bowel movements a day, not
the 20 she claimed in her testimony. *Id.* The ALJ also concluded that Plaintiff had
successfully "maintained the ability to work as a 911 dispatcher and a food server for
the schools" while she suffered from these symptoms. *Id.* at 873. Finally, he found
only partially credible her claims about back pain, asthma, and fatigue, given her
daily activities around the house and her California vacation. *Id.*

Overall, the ALJ gave the third-party consultant's medical assessments great
weight and adopted their RFC determinations of light work with certain limitations.
R. at 874. Based on the vocational expert's testimony about the demands of a 911
dispatcher job, he further concluded that Plaintiff retains the RFC to perform this
prior work. *Id.* Having found Plaintiff could perform prior work, he did not proceed
to Step 5 to examine whether Plaintiff could perform other work existing in the
national economy. Instead, he concluded Plaintiff was not "disabled" as defined
under the SSA from June 1, 2013, through the date of his decision. R. at 875.

9

## II.  Standard of Appellate Review

An ALJ's findings of fact are "conclusive" as long as they are supported by "substantial evidence."  42 U.S.C. § 405(g).  The "threshold for such evidentiary sufficiency is not high"; it "means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  Courts affirm any adequately supported denial, even if reasonable minds could disagree about disability status, *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008); but an ALJ must articulate a "logical bridge" from the medical evidence to the decision, *id.*; *see also Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008).  A court will remand a decision if it lacks evidentiary support or adequate discussion of the issues to form this requisite logical bridge. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).

## III.  Analysis

Plaintiff seeks reversal of the ALJ's decision, arguing that: (1) the ALJ imposed "an impermissibly high legal standard" on Plaintiff's subjective testimony when he found her "not entirely credible", [12] at 9–15; and (2) the ALJ's RFC analysis did not properly account for all of Plaintiff's impairments and failed to compare Plaintiff's RFC to the specific demands of her past 911 dispatcher job, *id.* at 4–9, 15–16.  In contrast, the Commissioner argues that: (1) there exists substantial evidence supporting the ALJ's RFC findings and assessment of Plaintiff's symptoms, [22] at

1–14; and (2) the ALJ properly concluded Plaintiff could return to her past relevant work as a 911 dispatcher, *id*. at 14–15.

After reviewing the full record and as discussed below, the Court rejects many of Plaintiff's arguments but agrees that the ALJ failed to account for the severity of her Crohn's disease symptoms—particularly regarding the frequency and urgency with which she must take bathroom breaks—when determining her RFC and ability to perform past relevant work as a 911 dispatcher.

### A. The ALJ Did Not Impose an "Impermissibly High" Standard to Plaintiff's Testimony

Plaintiff complains that the ALJ imposed an "impermissibly high" standard on her testimony when he found her subjective symptoms "not entirely consistent" with the record evidence. [12] at 9. Plaintiff analogizes the ALJ's "not entirely consistent" language to the "not entirely credible" boilerplate language that the Seventh Circuit has rejected as "meaningless" because it "yields no clue to what weight the trier of fact gave the testimony." *Id*. (quoting *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010)). Plaintiff also argues that the SSA rules only require "reasonably" consistent statements, not "entirely consistent" statements. [12] at 9 (citing SSR 16-3p. 2017 WL 5180304, at *3). Plaintiff's arguments fail.

First, as Plaintiff acknowledges, the Seventh Circuit only takes issue with "not entirely credible" language when offered without an explanation of which statements "are not entirely credible or how credible or noncredible any of them are." [12] at 9 (quoting *Martinez v. Astrue*, 630 F.3d 693, 696–97 (7th Cir. 2011). Here, the ALJ engaged in a detailed analysis of how Plaintiff's testimony differed from the medical

11

records and why he concluded it lacked some credibility. The Seventh Circuit demands nothing more.

Second, the ALJ did not impose an impermissibly high standard. The SSA ruling that Plaintiff references, SSR 16-3p, instructs a factfinder to analyze alleged symptoms in two steps: (1) evaluate whether the underlying medical impairments could "reasonably be expected to produce" the claimed symptoms; and (2) if so, evaluate the intensity and persistence of those symptoms based on all the record evidence even if "the level of pain an individual alleges may seem out of proportion with the objective medical evidence." 2017 WL 5180304, at *3.

Plaintiff argues that the ALJ should have accepted her testimony about the severity of her symptoms so long as they remained "reasonably" consistent with her medical impairments. [12] at 9. But SSR 16-3p's reference to "reasonableness" goes to the types of symptoms claimed, not the claimed intensity and persistence of those symptoms. A fact-finder need not accept as true a claimant's subjective testimony on intensity and persistence; rather, the rule requires the fact-finder to "examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements of other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." *Id.* at *4. Except for the errors discussed below with respect to the ALJ's analysis of Plaintiff's Crohn's disease symptoms, the ALJ properly engaged in this two-step analysis in evaluating her symptoms' intensity and persistence. He agreed that Plaintiff's impairments caused

12

the general symptoms that she alleged, but then discounted some of her testimony about the severity of those symptoms based upon his review of the entire record. Such analysis comports with the SSA rules.

## B. The ALJ's RFC Determination

In Step 2 of the 5-part test, the ALJ found that Plaintiff suffered from severe MDIs—namely, Crohn's disease/irritable bowel syndrome; Barrett's Esophagus; degenerative disc disease of the lumbar spine with lumbar radiculopathy; asthma due to allergies; and morbid obesity. R. at 865. He also found that she suffered from the following non-severe MDIs that do not cause significant functional limitations: (1) hypothyroidism; (2) knee issues; and (3) attention deficit disorder and adjustment disorder with anxiety. R. at 865–67. Further, he found the record did not support a diagnosis of fibromyalgia. *Id.* at 866. The ALJ then determined that Plaintiff retained the functional capacity to perform light work. *Id.* at 873.

Plaintiff contests the ALJ's RFC determination, arguing that he improperly rejected her fibromyalgia diagnosis and other joint/muscle symptoms; failed to properly account for her mental impairments; and failed to account for symptoms related to her Crohn's disease/irritable bowel syndrome. She also claims that, because the ALJ failed to properly account for her symptoms, he improperly determined she could perform her prior work as a 911 dispatcher. [12] at 4–9, 15–16

### 1. Fibromyalgia and Joint/Muscle Impairments

Contrary to Plaintiff's claims, the ALJ's decision confirms that he accounted for Plaintiff's joint and muscle impairments when he found that Plaintiff's RFC

13

limited her to light work with certain limitations in lifting, moving, and bending and set out detailed reasons for finding Plaintiff's subjective pain ratings only partially credible. R. at 866, 869–71, 873. He did not ignore her pain symptoms and agreed that her symptoms impaired *to some extent* her ability to sit, stand, and walk. But he explained that the medical records confirmed that physical therapy, injections, and Cymbalta alleviated some of her pain; she did not require surgery or medical devices; and on physical exams she showed "normal muscles strength, intact sensation, normal reflexes, limited tenderness and a normal gait." *Id*. at 873. He also gave great weight to the state-agency consultants who offered detailed opinions on Plaintiff's joint and muscle pain history and agreed that these impairments limited Plaintiff to light work with certain postural and environmental limitations. R. at 874.

Plaintiff next argues the ALJ erred by discounting her physician's fibromyalgia diagnosis and relying on the state-agency consultants who offered opinions before the physician diagnosed Plaintiff with fibromyalgia and other progressive joint issues. [12] at 5–6. The Court disagrees. The ALJ adequately set out his reasons for discounting the fibromyalgia diagnosis—he found that the physician only relied on Plaintiff's subjective complaints and did not review her medical history, and he noted that the rest of her medical records did not support such a diagnosis. R. at 866. Yet, even if the ALJ erred in discounting the fibromyalgia diagnosis or improperly took his "lay medical analysis" over that of a trained professional, [12] at 6, the error proves harmless. The ALJ still accounted for Plaintiff's numerous reported joint and

muscle symptoms (whether classified as fibromyalgia or not) in the RFC limitations he imposed. Further, even if the state-agency consultants did not review all the medical records (because some post-date their record review), the ALJ reviewed them and concluded that they did not diminish the credibility of the consultants' muscle/joint impairment evaluation. R. at 868–74. To the contrary, the subsequent records confirmed that Plaintiff reported significant pain relief from Cymbalta, injections, and other non-invasive therapies. *Id.* The records also supported, rather than undermined, the consultants' conclusions that Plaintiff suffered with muscle/joint conditions that impaired her ability to perform certain types of work but did not render her unable to perform light work of a primarily sedentary nature. *Id.*

### 2. Concentration Impairments

Plaintiff next argues that the ALJ's RFC evaluation failed to account for her concentration impairments. R. at 8–9. According to Plaintiff, the ALJ committed reversable error when he failed to question the vocational expert regarding the impact that concentration impairments would have on the ability to perform certain jobs. *Id.* Not so.

As discussed above, the two-part test for alleged symptoms required the ALJ to evaluate whether an MDI reasonably could cause certain alleged symptoms and, if so, evaluate the frequency and persistence of those symptoms. Here, the ALJ analyzed, in detail, Plaintiff's claimed mental impairments and concluded her "medically determinable mental impairments of attention deficit disorder and adjustment disorder with anxiety, considered singly and in combination, do not cause

15

more than minimal limitation on the claimant's ability to perform basic mental work activities and are therefore non-severe." R. at 866–67. The ALJ also analyzed the medical records and Dr. Brauer's psychological consultative examination, finding that, among other things, these records show "concentration and attention to be within normal limits," and Plaintiff's more recent medical records reveal she "reported feeling well overall." R. at 871.

Having found that the medical records confirm Plaintiff's "concentration and attention to be within normal limits" it comes as no surprise that the ALJ did not question the vocational expert regarding what impact, if any, such "normal" concentration and attention would have on Plaintiff's ability to work. In other words, having found that Plaintiff's non-severe mental impairment would not reasonably cause the concentration and attention symptoms she claimed and that here concentration fell "within normal limits," there remained nothing more for the ALJ to evaluate.

### C.   Plaintiff's Crohn's Disease Symptoms and Limitations

Finally, Plaintiff argues that the ALJ's RFC determination failed to properly account for her Crohn's disease symptoms and limitations. The Court agrees.

First, as discussed above, the ALJ acknowledged that the medical records showed Plaintiff consistently reported frequent abdominal cramps and that her bowel movement frequency fluctuated over time, but he did not credit Plaintiff's claimed abdominal pain level or bathroom frequency of twenty times a day. In addition, he criticized Plaintiff for self-discontinuing medications that she previously reported

alleviated her bowel incontinence. He also found that, even if she had such symptoms, he believed she "maintained the ability to work as a 911 dispatcher and a food server" and did so "without alleging serious issues." R. at 873. After making these credibility determinations, he summarily concluded that Plaintiff could still reasonably perform her prior job as a 911 dispatcher. R. at 874.

Plaintiff argues on appeal that the ALJ failed to properly consider her bathroom needs when evaluating her RFC and her past work as a 911 dispatcher. [12] at 5–7. Plaintiff highlights the vocational expert's testimony that a 911 dispatcher must be on-task more than 95 percent of the time and all light duty occupations require at least an 85 percent on-task rate. *Id*. at 6. She insists that her testimony and medical records confirm that the frequency, persistence, and severity of her bowel movement "precluded any employment possibilities." *Id*. at 7.

The Seventh Circuit addressed similar issues in *Sikorski v. Berryhill*, 690 Fed. App'x 429 (7th Cir. 2017), where a claimant alleged that her Crohn's disease symptoms and bowel incontinence, among other things, rendered her disabled. There, the ALJ found the claimant's testimony about the severity of her impairments and bathroom needs only partially credible; noted a lack of clear documentation about her Crohn's disease flare-ups; and found she could work in 2005 "when her Crohn's symptoms were worse." *Id*. at 432. The Seventh Circuit reversed. The court noted that the vocational expert opined that an employee may take five-minute bathroom breaks every two hours for the occupations under consideration, but that "a person requiring ten-minute breaks would not be able to find competitive work." *Id*. at 432.

17

Given this, the court held that ALJ failed to resolve the frequency and duration of the claimant's bathroom break needs and "did not adequately justify her conclusion that Sikorksi could perform her past work." *Id.* at 433. The court also rejected the ALJ's finding that the claimant successfully performed her job in 2005, stating "the record of her past work does not reflect whether her employer was forgiving by making an exception to allow her lengthy bathroom breaks. Moreover Sikorski testified at the hearing that her need during her shipping-checker job to spend significant time in the bathroom caused her to *leave* this job." *Id.* at 433.

The ALJ's decision here suffers from the same flaws as the one in *Sikorski*. Here, the vocational expert testified that a 911 dispatcher's on-task rate could not fall below 95 percent more than one day per month; nor could a 911 dispatcher have two unscheduled absences per month. R. at 920–22. He also testified that no light work occupation permits an employee to fall below 85 to 90 percent on-task time. *Id.* at 920. Even if the ALJ discredited Plaintiff's claimed bathroom use frequency, the medical records show that, most recently, Plaintiff used the bathroom 3–5 times a day on a good day and 10–15 times a day on a bad day. R. at 1748–53. And even if Plaintiff occasionally self-discontinued medications, the records indicate that she still suffered bathroom urgency (albeit less frequently) while medicated and that the medications' effectiveness varied over time. R. 1304, 1322, 1324, 1414, 1623, 1632, 1748–53. Plaintiff also testified that she suffers "bad days" up to seven times per month and requires 5–10 minute for each bathroom break. She also testified that she experienced significant stress as a 911 operator, which exacerbated her flare ups.

Yet, the ALJ failed to evaluate whether and to what extent Plaintiff's bathroom needs could impact her ability to perform her past work as a 911 dispatcher (or any other light work). He also did not ask the vocational expert if a 911 dispatcher could take urgent five- or ten-minute breaks, regardless of the frequency. Nor did he consider Plaintiff's claims about stress exacerbating her symptoms. Further, contrary to the ALJ's findings, the record suggests Plaintiff did not maintain "the ability to work as a 911 dispatcher and a food server." Plaintiff testified that she had to quit her 911 dispatcher job because she called out sick too frequently and needed too many bathroom breaks. She also testified, and her employee files confirm, that her food service employer did not ask her back for a second year because of her attendance issues, which related to these symptoms (and others). R. at 890–91, 1164–66.

This constitutes reversable error. *See, e.g., Sikorski*, 690 Fed. Appx. at 433; *Richard K. v. Saul*, No 18-C-7316, 2020 WL 1986985, at 4–5 (N.D. Ill. Apr. 17, 2020) (finding reversable error where an ALJ's RFC evaluation "did not incorporate any bathroom-related limitations" because she failed to determine how long the claimant "needs for breaks and whether an employer could tolerate such work interruptions."); *Mark J. v. Saul*, No 18-C-8479, 2020 WL 374676 (N.D. Ill. Jan. 23, 2020) (same).

As another court emphasized in *Manker v. Berryhill*, No. 16-C-10704, 2017 WL 6569719, at *4 (N.D. Ill. Dec. 22, 2017), the frequency and duration of bathroom breaks are "highly relevant to the denial of benefits" for a claimant suffering from irritable bowel syndrome. For example, if Plaintiff requires only three bathroom breaks a day lasting five minutes each, then perhaps she can perform the 911

19

dispatcher job. But, if she required five bathroom breaks of ten minutes each, even if only twice a month, then the vocational expert's testimony suggests she could not perform her 911 dispatch job, particularly if the need comes on suddenly. If she had two bad days a month with more than eight bathroom breaks of ten minutes each, then, according to the vocational expert, this may render her unemployable in any light duty job.

The Commissioner counters that the ALJ found "no off-task time was required." [22] at 7. Yet, the Commissioner fails to point to where the ALJ made such a finding. The Commissioner also argues that the state-agency consultants' findings and the vocational expert's testimony provide sufficient support for the ALJ's RFC finding. [22] at 14–15. But the consultants also did not discuss Plaintiff's bathroom break needs and only generally considered if she could perform light duty work with certain limitations, not whether she could perform light duty work that demands greater than 95 percent on-task time. Further, as discussed above, the ALJ failed to ask the vocational expert numerous questions about the impact of some of these Crohn's disease-related symptoms. Just like the Seventh Circuit held in *Sikorksi*, 690 Fed. Appx. at 433, this Court "cannot be confident that the ALJ provided the vocational expert with a complete picture" of Plaintiff's RFC.

Accordingly, the Court reverses and remands this case so that the ALJ can evaluate how (if at all) Plaintiff's Crohn's disease symptoms—including the sometimes urgent and frequent need for bathroom breaks, associated time off-task

20

and off-work, and impact of stress on those symptoms—impact her ability to perform her past work as a 911 dispatcher or any alternative light duty work.

## IV.  Conclusion

For the reasons discussed above, the Court grants the Plaintiff's request for reversal [12] and denies the Commissioner's motion for summary judgment, [21]. Pursuant to 42 U.S.C. § 405(g), the Court reverses the Commissioner's decisions denying benefits and remands the case for further proceedings consistent with this opinion.  Civil case terminated.

Dated: May 27, 2022                        Entered:

John Robert Blakey
United States District Judge

21